IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| ROBERT C. WALKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:22-CV-00034-BU |
| ZACHARY DAVIS, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Robert C. Walker, proceeding *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against Defendant Zachary Davis, an officer with the Brownwood Police Department (BPD), alleging that Davis violated his constitutional rights. Dkt. No. 33. Defendant has filed a Motion to Dismiss asserting that Plaintiff's claims must be dismissed because (1) the *Heck* bar precludes his claim (2) Defendant's actions are protected under qualified immunity and (3) the Texas Tort Claims Act bars Plaintiff's assault claim. Dkt. No. 35. For the reasons below, the undersigned RECOMMENDS that the Court GRANT Defendant's Motion in part.

## I.    JURISDICTION

Plaintiff brings this action under 42 U.S.C. § 1983, providing the Court with subject-matter jurisdiction under 28 U.S.C. § 1331. Venue is proper in the San Angelo Division of the Northern District of Texas because the events giving rise to Plaintiff's claims occurred

1

in or near Brownwood, Texas. *See* Dkt. No. 33 at 4. The undersigned has the authority to enter these Findings, Conclusions, and Recommendations (FCR) after United States District Court Judge James Wesley Hendrix transferred Plaintiff's case to the undersigned for judicial screening under 28 U.S.C. §§ 1915, 1915A. Dkt. No. 7; 28 U.S.C. § 636(b)(1)(B).

## II.    FACTUAL BACKGROUND

For the purpose of summarizing this case's factual background, the Court assumes all well-pleaded allegations in Plaintiff's Amended Complaint are true.

On April 27, 2021, Plaintiff's sustained a non-life-threatening cut to his forehead at or around 5:00 p.m.[1] Dkt. No. 33 at 5-6. After taking fifteen minutes to treat the injury, Plaintiff sat outside on his porch at which point his wound had stopped bleeding. *Id*. at 6. A neighbor observed blood on Plaintiff's face and called 911. *Id*. In response, BPD, including Defendant, and other emergency personnel arrived at Plaintiff's residence.[2] *Id*.

This was not the first time Defendant had interacted with Plaintiff. *Id*. at 6-7. Plaintiff was diagnosed with paranoid schizophrenia in March of 2020. *Id*. at 4. As a result of his condition, Plaintiff regularly called BPD during episodes of paranoia. *Id*. at 5. Defendant and other BPD officers had threated Plaintiff with criminal charges if he continued to call them for help with his imagined dangers. *Id*. at 6. Defendant had also responded to Plaintiff's report of a "shady deal" occurring outside of a laundromat Plaintiff

---

[1] Plaintiff claims that an unknown intruder broke into his apartment while he was home and struck him in the head, causing this injury. Dkt. No. 33 at 5. Prior to fleeing, Plaintiff alleges that the intruder planted or dropped drug paraphernalia and a Playboy magazine at his residence. *Id*. at 6.
[2] Plaintiff had been sitting on his front porch for approximately thirty minutes before BPD and other emergency personnel responded. Dkt. No. 33 at 6.

was in. *Id*. at 7. Defendant was consistently standoffish and cold towards Plaintiff during these interactions. *Id*.

On the day of the incident, Defendant exhibited a similar demeanor towards Plaintiff.[3] *Id*. Upon arriving at the scene, Defendant handcuffed Plaintiff and placed him on a stretcher with the help of his fellow officers. *Id*. Defendant did not provide a reason for restraining Plaintiff. *Id*. Plaintiff remained compliant during the encounter and was not experiencing any acute psychosis or delusions, as he had taken his required medications that morning.[4] *Id*. Apart from these medications, Plaintiff had not consumed any other drugs or substances. *Id*.

There were no efforts made to treat Plaintiff's head injury at his residence. *Id*. Plaintiff did not request medical treatment because of his general strong distrust of professional medical intervention, and he often self-treated his injuries instead of seeking professional help. *Id*. at 7-8. Despite this, Plaintiff believed that he had to go to the hospital in order to avoid an altercation with the police. *Id*. at 8. Plaintiff, who was handcuffed by an officer he believed to be hostile towards him, was too afraid to resist any of the officers' demands and allowed the responders to take him to the hospital. *Id*. Before leaving in the ambulance, a paramedic asked whether Plaintiff was under arrest. *Id*. Defendant stated that he was not and removed Plaintiff's handcuffs. *Id*.

Plaintiff and Defendant traveled to the hospital separately. *Id*. In the ambulance,

---

[3] On the day of the incident, Defendant denied remembering Plaintiff and their prior interactions. Dkt. No. 33 at 7.

[4] Plaintiff took Risperidone and Trazadone for his paranoid schizophrenia. Dkt. No. 33 at 4-5. These medications kept him "generally calm and lucid" though he continued to suffer from episodes of paranoia. *Id*. at 5.

Plaintiff rejected paramedics' attempt to take his blood pressure and did not receive any other medical treatment in light of this refusal. *Id*. Upon arriving at Hendrick Medical Center-Brownwood, Plaintiff exited the ambulance and walked towards the emergency room (ER). *Id*. Plaintiff waited on a stretcher parked in the vestibule outside of the ER.[5] *Id*. ER staff did not immediately treat Plaintiff's wound upon his arrival nor did they, at any point, test Plaintiff for alcohol, narcotics, or any other substance. *Id*. at 9. Plaintiff was not restrained during this time and was non-combative as he sat on the stretcher, reading a magazine. *Id*.

Defendant asked Plaintiff for his son's contact information. *Id*. Defendant called the Plaintiff's son, informed him of the previous events and asked him to pick his father up from the hospital. *Id*. During the thirty minutes he waited outside of the ER, Plaintiff did not request medical treatment for his cut which had since stopped bleeding. *Id*. at 9-10. Though medical staff attempted to treat Plaintiff's injury, he repeatedly rejected such attempts and maintained that he did not wish to receive any medical treatment. *Id*.

Shortly before 7:00 p.m., ER staff brought Plaintiff into a medical treatment room. *Id*. at 10. When Plaintiff realized he was about to be examined and treated against his expressed wishes, he screamed "No!" multiple times and, when no one listened, attempted to get off the stretcher to escape medical treatment. *Id*. In response, Defendant pushed Plaintiff face-down onto the stretcher. *Id*. Defendant leaned his weight deeper into Plaintiff's back to keep him still. *Id*. With Defendant on top of him, Plaintiff's head was

---

[5] Plaintiff initially tried to enter the ER but Defendant had grabbed him and prevented him from entering. Dkt. No. 33 at 8-9.

hung over the end of the stretcher and he was immobilized.[6] *Id*. In this position, Plaintiff bit Defendant's hand.[7] *Id*. Defendant then handcuffed Plaintiff and continued to press his body weight into him, forcing Plaintiff to remain on the stretcher. *Id*. Despite his repeated refusals of treatment for his non-life-threatening wound, Defendant had handcuffed and held Plaintiff down as a doctor stapled the cut on his forehead closed. *Id*. at 11. The procedure occurred nearly an hour after Plaintiff first arrived at the hospital. *Id*.

When the medical procedure was completed, Defendant momentarily left the room. *Id*. After medical personnel had connected Plaintiff to a heart monitor and blood pressure cuff, Defendant re-entered and informed Plaintiff that he was going to jail. *Id*. Defendant did not tell Plaintiff why he was under arrest, nor did he search or pat down Plaintiff. *Id*. After Plaintiff was placed under arrest, he was given a tetanus shot and transported to Brown County Jail. *Id*. Unbeknownst to Plaintiff, his son had arrived at the hospital to retrieve him at some point prior to the stapling, but Defendant told him that his father would not be free to return home. *Id*. at 11-12. Plaintiff was charged with aggravated assault on a peace officer for his attempt to bite Defendant and eventually pleaded guilty.[8] Dkt. Nos. 33

---

[6] Plaintiff alleges that these events triggered an episode of acute psychosis. Dkt. No. 33 at 10. In this delusional state, Plaintiff believed that Defendant was trying to kill him. *Id*. As explained below, Plaintiff's state conviction and its *Heck* implications prevent this Court from finding either Plaintiff incompetent at this time or that Plaintiff's conduct constituted self-defense.

[7] Plaintiff alleges that he only attempted to bite Defendant's hand. Dkt. No. 33 at 10. However, Plaintiff was convicted in state court of biting Defendant. Dkt. No. 35 at 12-16. As discussed below, *Heck* prevents the Court from making any finding that contradicts a valid criminal conviction. 512 U.S. 477, 487 (1994). Accordingly, the Court cannot accept as true Plaintiff's allegation that he only attempted to bite the Defendant.

[8] Plaintiff also pled guilty to possession of a controlled substance. Dkt. No. 35 at 17-21. This charge and conviction arose from the two glass pipes Plaintiff alleges the intruder left in his apartment. Dkt. No. 33 at 6, 12. Plaintiff had placed the glass pipes in his pocket upon discovering them and volunteered them to Defendant after his arrest. *Id*. at 11.

at 12; 35 at 12-15.

Plaintiff alleges that Defendant's conduct has caused him physical, mental, and emotional injuries. Dkt. No. 33 at 12. The forced stapling procedure has triggered symptoms of post-traumatic stress disorder (PTSD) and has aggravated his paranoid schizophrenia. *Id*. at 13. Further, Defendant's act of forcing Plaintiff down while holding his hands behind his back have caused physical damage to his arms and rotator cuffs. *Id*.

### III.    PROCEDURAL HISTORY

Plaintiff filed this present action on July 21, 2022, alleging several violations of his constitutional rights. Dkt. No. 1. The Court then transferred this case to the undersigned for purposes of judicial screening after which, Plaintiff consented to the Court exercising its full jurisdiction. Dkt. Nos. 7, 10. At the conclusion of its judicial screening, the Court dismissed Plaintiff's claims against Defendant for false arrest and wrongful seizure, and his claims against the City of Brownwood. Dkt. No. 23. But the Court found that Plaintiff had stated a plausible excessive force claim and substantive due process claim against Defendant. *Id*. The Court ordered Defendant to file an answer or other response to Plaintiff's surviving claims. *Id*. In that same March 1, 2024 Order, the Court stayed and administratively closed this case while it sought appointed counsel for Plaintiff. On April 8, 2024, the Court reopened the case, lifted the stay, and appointed counsel for Plaintiff. Dkt. No. 26. Plaintiff's counsel then filed an Amended Complaint, adding a state law assault claim against Defendant. Dkt. No. 33. Defendant has now moved to dismiss all claims. Dkt. No. 35.

## IV.    LEGAL STANDARDS

Dismissal for failure to state a claim under Rule 12(b)(6) "turns on the sufficiency of the 'factual allegations' in the complaint.'" *Smith v. Bank of Am., N.A*., 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing FED. R. CIV. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept well-pleaded factual allegations as true, viewing them in the light most favorable to the plaintiff. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). "Well-pleaded" means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

Substantive plausibility does not require a plaintiff to plead enough facts to establish the events at issue probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–79). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. When plaintiffs "have not nudged their claims across

7

the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V. ANALYSIS

Defendant moves to dismiss this case on three grounds. First, Defendant argues that Plaintiff's claim is barred under *Heck v. Humphrey*. Second, Defendant argues that the conduct underlying the present suit is protected under qualified immunity. Finally, Defendant contends the Texas Tort Claims Act requires dismissal of Plaintiff's assault claim. The Court will address each of these arguments in turn.

I.      *Heck* bars certain aspects of Plaintiff's excessive force claim.

Defendant relies on the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994), for the proposition that Plaintiff's excessive force claim is barred by his previous state conviction. Dkt. No. 35 at 5. As first articulated in *Heck*, a plaintiff's § 1983 complaint must be dismissed if a judgment in the plaintiff's favor would imply invalidity of a prior conviction or sentence. 512 U.S. at 487. In determining whether *Heck* applies, courts must focus on "whether success of the excessive force claim requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). Absent a showing that the conviction "has been reversed, invalidated or otherwise set

8

aside," courts will not allow a plaintiff to utilize §1983 to collaterally attack their criminal convictions. *Robinson v. Lipps*, No. 6:18-CV-01062, 2021 WL 865986, at *3 (W.D. La. Mar. 5, 2021). However, if after this "analytical and fact-intensive" inquiry the Court concludes that the civil action is "conceptually and factually distinct" from the previous conviction, the claim is not barred. *Bush*, 513 F.3d at 497.

Here, Plaintiff was charged with and pled guilty to assault on a peace officer as a result of biting Defendant at the hospital. Dkt. No. 35 at 12-16.  In doing so, Plaintiff was found guilty of "intentionally, knowingly, or recklessly caus[ing] bodily injury to [Defendant] …. by biting him, and [Plaintiff] knew that [Defendant] was a police officer, and [Defendant] was lawfully discharging an official duty namely securing the defendant in handcuffs." *Id*. at 12.

Plaintiff does not plead that this conviction has been vacated or otherwise overturned. *See generally* Dkt. No. 33. Defendant argues that a finding of excessive force would (1) negate an element of the conviction, namely that he was acting lawfully when securing Plaintiff in handcuffs (2) invalidate the state court conviction by holding that Plaintiff was justified in using self-defense, ignoring that the assault and excessive force are neither separate nor distinct events.[9]

To engage in the "analytical and fact intensive" analysis required under *Heck*, the

---

[9] When considering a motion to dismiss, the Court may rely "on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Ramos v. Taylor*, 646 F.Supp. 3d 807, 814 (W.D. Tex. 2022) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008). Although the Plaintiff's state conviction was not within or attached to his Complaint, the Court finds it proper to take judicial notice of the state conviction. *See* Dkt. No. 33; *United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020) (finding that a court may judicially notice a record of a state court conviction because it is a reliable source that cannot reasonably be doubted).

Court must first distinguish the three instances of conduct that underlies the excessive force claim. *See Bush*, 513 F.3d at 497. Plaintiff alleges that Defendant engaged in excessive force when he (1) held Plaintiff down on the stretcher, before placing him in handcuffs (2) placed Plaintiff in handcuffs in an aggressive manner and (3) held Plaintiff down on the stretcher, after placing him in handcuffs. Dkt. No. 33 at 10-11. The Court will analyze the implication the state conviction has, if any, on each alleged instance of excessive force separately, beginning with the Defendant's act of handcuffing Plaintiff.

a. *Plaintiff's prior conviction bars a claim that Defendant acted unlawfully when handcuffing him.*

Defendant argues that the excessive force claim as it relates to the act of handcuffing Plaintiff negates an element of the state conviction, specifically that Defendant was lawfully discharging his duties. Dkt. No. 35 at 6-7. In response, Plaintiff urges the Court to define "force" as the totality of the circumstances and find that the handcuffing, in combination with holding Plaintiff down, should be evaluated together under the excessive force claim. Dkt. No. 40 at 12 n.1. Plaintiff's conviction states that Defendant was acting lawfully when securing Plaintiff in handcuffs. Dkt. No. 35 at 12. Accordingly, any excessive force claim based on the handcuffing is barred under *Heck* because it necessarily contradicts an element of the state conviction, specifically that the handcuffing was lawful.[10]

---

[10] The Court declines Plaintiff's invitation to evaluate "force" under a totality of the circumstances analysis. The principles behind *Heck* prevent the Court from analyzing the force in general terms. *See Bush*, 513 F.3d at 497 (describing the *Heck* analysis as a "fact-intensive inquiry[.]").

Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant's motion to dismiss Plaintiff's excessive force claim as it relates to Defendant's act of handcuffing him.

> b. Heck *bars a finding that the events leading up to the arrest constituted excessive force because doing so would be inconsistent with the state conviction.*

Defendant argues the Court cannot find that his act of holding Plaintiff down on the stretcher prior to Plaintiff biting him constitutes excessive force without challenging the state conviction. Specifically, Defendant contends that a finding that he was engaging in excessive force immediately prior to the assault would imply that Plaintiff was justified in biting Defendant. Dkt. No. 35 at 6-7. Defendant also claims that the conduct both before and after the handcuffing is not separate or distinct from the state conviction and so it must be barred under *Heck*. Dkt. No. 41 at 1.

An excessive force claim brought under the Fourth Amendment requires a finding that the officer's use of force was unreasonable. *Price v. City of Bossier*, 841 Fed.Appx. 650, 653 (5th Cir. 2021). Courts recognize the relationship between a plaintiff's resistance and the reasonableness of the officer's use and degree of force. *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996). Where the plaintiff's efforts to resist the officer result in an assault conviction, the plaintiff may not subsequently bring an excessive force claim if the alleged force occurred within the same "single violent encounter" as the assault. *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656-57 (5th Cir. 2007). Because the assault is a manifestation of plaintiff's resistance, a court could not find that force was unreasonable without also

11

finding that the plaintiff's attempts to resist that force were justified. *Price*, 841 Fed.Appx. at 653.

Alternatively, if the plaintiff stops all efforts to resist and then the defendant uses force, the Court can evaluate the reasonableness of the force without disturbing the state conviction. *Bush*, 513 F.3d at 498. In this case, the two incidents are "temporally and conceptually distinct" with the plaintiff's acquiescence serving as a buffer between the conduct giving rise to the conviction and the conduct giving rise to the excessive force claim. *Id*.

For example, the court in *Price*, found that the plaintiff's battery conviction barred his §1983 excessive force claim against the officer he battered. 841 F.App'x at 653. In dismissing his excessive force claim against the officer, the court noted that his constitutional claim arose from the same violent encounter as his state conviction. *Id*. at 653. The court, under *Heck*, could not find the officer's force unreasonable without calling into question the validity of the battery conviction as it would imply the plaintiff was justified in resisting. *Id*. . There was no distinguishing factor the court could use to find the battery and excessive force events temporally and conceptually distinct. *Id*. at 654. In rejecting Plaintiff's attempts to do so based on time and location, the court held that the Plaintiff never alleges he stopped resisting during the encounter. [11] *Id*. Therefore, *Heck* precluded the plaintiff's excessive force claim. *Id*.

---

[11] The plaintiff in *Price* was involved in a violent encounter with police officers that lasted somewhere between fifteen and twenty minutes in duration and took place over the span of sixty to eighty yards. 841 F.App'x at 652.

Here, like *Price*, Plaintiff's describes one single violent encounter beginning with Defendant forcing him onto the stretcher and leaning his body weight into him. As a result of Defendant's force, combined with his other skewed perceptions of reality, Plaintiff states he bit Defendant's hand as an act of self-defense. Dkt. No. 33 at 10-11. In other words, Plaintiff attempted to bite Defendant's hand in an effort to resist his use of force. *Id*. Because a finding of excessive force would imply that Plaintiff was justified in engaging in the conduct for which he was convicted, the claim is barred under *Heck*. *See Price*, 841 F.App'x at 653. In arguing that the assault was a product of Defendant's use of force, Plaintiff further demonstrates the fluidity of the two events. [12] *See* Dkt. No. 33 at 10. Plaintiff did not stop resisting at any point nor is there any other intervening factor that the Court could use to distinguish the assault from the conduct underlying the excessive force claim.

Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant's motion to dismiss Plaintiff's excessive force claim as it relates to Defendant's conduct prior Plaintiff's assault.

      c.  Heck *does not bar Plaintiff's excessive force claim regarding Defendant's conduct after the handcuffing.*

Plaintiff argues that, at minimum, the excessive force which occurred after he was arrested and stopped resisting is separate and distinct from the facts underlying his past

---

[12] Plaintiff states "[a]s a direct and proximate cause of Davis's use of force in immobilizing him on the stretcher, and because he could not move, escape or defend himself, Mr. Walker began to experience an episode of acute psychosis in which he held a sincere and terrified belief that Davis was trying to kill him….Mr. Walker – unsure of what was happening, unable to move his body except for his head, and fearing for his life—turned his head and attempted to bite Davis's hand." Dkt. No. 33 at 10.

conviction. Dkt. No. 40 at 7-9. Defendant argues that his final use of force, holding Plaintiff down on the stretcher, is inadequately pled. Dkt. No. 41 at 2.

As discussed above, Plaintiff's excessive force claim can only survive if it is "temporally and conceptually distinct" from the factual basis of his assault conviction. *Bush*, 513 F.3d at 498. For example, in *Bush*, the plaintiff's excessive force claim was not barred by her resisting arrest conviction. 513 F.3d at 496. In *Bush*, the plaintiff pulled away from the defendant when he attempted to place her under arrest. *Id*. However, she contended that she stopped resisting when defendant had placed her in handcuffs. *Id*. It was after she ceased resisting that she claims the defendant forced her face into a nearby vehicle, injuring her jaw and teeth. *Id*. The court held that, if true, plaintiff's decision to stop resisting distinguished the facts underlying the conviction from those underlying the constitutional claim. *Id*. at 500.

Here, taking Plaintiff's well-pleaded facts as true, Defendant continued to hold Plaintiff down after he had been restrained with handcuffs and stopped resisting.[13] Though temporally this third use of force may have been close in time to the facts underlying the state conviction, it is conceptually distinct. Specifically, the fact that Defendant had successfully restrained and immobilized Plaintiff distinguishes this use of force from the underlying state conviction. *See Bush*, 513 F.3d at 495(finding that excessive force was not barred by *Heck*, even though the arresting officer administered force shortly after the

---

[13] Defendant argues that the Amended Complaint fails to state a claim for excessive force after Plaintiff was placed in handcuffs. Dkt. No. 41 at 2. This argument is unavailing as Plaintiff states "[t]hroughout the procedure, Davis continued to press Mr. Walker forcefully onto the stretcher notwithstanding that Mr. Walker was already immobilized with handcuffs." Dkt. No. 33 at 11.

assault, because the plaintiff was restrained and no longer resisting); *Price*, 841 F. App'x at 654 (finding the constitutional claim barred under *Heck* noting that Plaintiff did not allege that he had stopped resisting at the time of the excessive force).

Accordingly, the undersigned RECOMMENDS that the Court DENY Defendant's motion to dismiss Plaintiff's excessive force claim as it relates to Defendant's conduct after Plaintiff was restrained in handcuffs.

II.    <u>Taking the well-pleaded facts as true, the Court cannot find that the Defendant's conduct is protected under qualified immunity.</u>

Defendant urges the Court to dismiss Plaintiff's excessive force claim and substantive due process claim under qualified immunity. The Court is required to resolve questions of qualified immunity "at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 2 635, 646 n.6 (1987); *see also Carswell v. Camp*, 37 F.4th 1062, 1067 (5th Cir. 2022). A government official may be entitled to qualified immunity from civil damages if their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In deciding whether a defendant is entitled to qualified immunity, courts consider: "(1) [whether] the official violated a statutory or constitutional right, and (2) [whether] the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021). At the motion to dismiss stage, the Court must find that the plaintiff has pled facts which, if true, "both allow the Court to draw the reasonable inference that the defendant is liable for the harm and that defeat a qualified immunity defense with equal specificity." *Backe v.*

15

*LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

    *a.  Plaintiff has stated plausible constitutional claims against Defendant.*

    Defendant argues Plaintiff has failed to state either a substantive due process claim or an excessive force claim for purposes of qualified immunity. Defendant contends that Plaintiff's substantive due process right was not violated because "[t]he medical treatment only occurred after he assaulted Davis and was placed under arrest and handcuffed." Dkt. No. 35 at 8. In addressing Plaintiff's Fourth Amendment claim, Defendant asserts that *Heck* bars this Court from finding an excessive force claim and, in the alternative, any claim that does survive *Heck* is not adequately pled. *Id.* at 2.

    An officer may use reasonable force to facilitate medical treatment if the compelled individual does not have a right to refuse medical treatment. *See Sullivan v. Bornemann* 384 F.3d 372, 378 (7th Cir. 2004) (holding that an officer's act of restraining the arrestee to enable the nurse to administer unwanted treatment was not unreasonable). Accordingly, because a Fourteenth Amendment violation would inform the Court's analysis of the excessive force claim, the Court will first determine whether Plaintiff had a constitutional right to refuse medical care.

    1.  <u>Plaintiff has stated a plausible violation of his Fourteenth Amendment rights.</u>

    The Due Process Clause of the Fourteenth Amendment provides both substantive and procedural rights. *Allbright v. Oliver*, 510 U.S. 266, 271. The right to bodily integrity is included under an individual's substantive due process rights and encompasses a competent individual's right to refuse medical treatment. *Id.*; *Thompson v. Upshur Cnty.*, 245 F.3d 447, 461 n.10 (5th Cir. 2001). However, evidence of a violation of one's right to

bodily integrity does not end the inquiry. *Cruzan by Cruzan v. Dir., Missouri Dep't. of Health*, 497 U.S. 261, 279 (1990). Courts must balance the plaintiff's liberty interest against the relevant state interest and, must only find a constitutional violation where the plaintiff's interest is not outweighed by the state interest. *Id.* (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

### A. Plaintiff has demonstrated that Defendant violated his Fourteenth Amendment rights.

At the time of the incident, Plaintiff had the right to refuse medical treatment as he alleges that he was competent when arriving at the hospital. *See Cruzan*, 497 U.S. at 279 (finding that competent individuals have the right to refuse medical treatment). Further, Plaintiff's state conviction compels the conclusion that he remained competent moments before the procedure as he continued to refuse treatment.[14] *See* Dkt. No. 35 at 12 (stating that Plaintiff "intentionally, knowingly, or recklessly" assaulted Defendant); *Heck*, 512 U.S. at 489 (holding a court may not issue a judgment that would necessarily imply the validity of plaintiff's conviction). Additionally, Plaintiff pleads his head injury was not life threatening and did not require immediate medical attention. Dkt. No. 33 at 16; *see Simmons v. Hays Cnty. Sheriff's Dep't*, No. A-11-CV-343-LY, 2012 WL 12866672, at *6 (W.D. Tex. Sept. 21, 2012), *aff'd sub nom*, *Simmons v. Hays Cnty. Sheriff's Dep't*, 552 F.

---

[14] Although Plaintiff states in his Complaint that he was experiencing an episode of acute psychosis at the time of the procedure, *Heck* requires the finding that he was competent at the time he bit Defendant. *See* Dkt. No. 33 at 10 (stating that Plaintiff was not lucid when Defendant began to force him on to the stretcher and bit Defendant in this state). To find that the Plaintiff was not competent would negate the *mens rea* element of his conviction. *See* Dkt. No. 35 at 12 (listing one of the required elements of assault on a peace officer as "intentionally, knowingly, or recklessly" committing the assault).

App'x 348 (5th Cir. 2014) (finding no substantive due process violation where the officers administered previously refused treatment to save plaintiff from life-threatening injuries).

In sum, Plaintiff has plausibly alleged that, while in a lucid state, he refused medical treatment for a non-life-threatening injury. Nevertheless, Defendant forced him to undergo a medical procedure. This is sufficient to state a constitutional claim under the Fourteenth Amendment.

### B.  Plaintiff's liberty interest was not outweighed by a state interest.

Defendant implies that he did not violate Plaintiff's Fourteenth Amendment because his wound was stapled after his arrest. Dkt. No. 35 at 8. Courts have recognized that the state may have an overriding interest in compelling medical treatment, even against an individual's consent, where the individual is a pre-trial detainee. *See Sullivan*, 384 F.3d at 376 ("[Prisons] have an obvious interest in ensuring that detainees admitted to the jail do not need immediate medical care[.]"). However, drawing all reasonable inferences in Plaintiff's favor, the Court cannot find he was a pretrial detainee at the time of the unwanted medical treatment. Plaintiff alleges that Defendant did not inform him of his arrest until after the forced medical procedure was complete. [15] Dkt. No. 33 at 11.  The only indication that Plaintiff was under arrest at the time of the medical procedure was the handcuffs Defendant had restrained him in. However, the Court cannot infer that Plaintiff was under arrest solely because he was placed in handcuffs considering that Defendant had previously placed Plaintiff in handcuffs for a purpose other than arrest. Dkt. No. 33 at 8.

---

[15] Instead, Defendant left Plaintiff's hospital room, and did not inform Plaintiff that he was under arrest until after he returned. Dkt. No. 33 at 11.

18

Further, it would be troubling to give Plaintiff pre-trial detainee status at the time of treatment. To do so, would be to ignore the events leading up to the unwanted medical procedure. Prior to the initiation of the unwanted treatment and the chaos that ensued, Defendant had no intention of, nor any basis for, arresting Plaintiff. Defendant did not have the intention to take Plaintiff to jail as he had called Plaintiff's son to retrieve him from the hospital. *See* Dkt. No. 33 at 8-10. It was not until Defendant began to initiate the unwanted treatment did he stumble into, if not create, ground for arresting Plaintiff. In doing so, Defendant eliminated the very right Plaintiff was attempting to exercise. *See id*. at 10; *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996) (finding it would be unconstitutional for a state actor to provoke the plaintiff in order to create the pretext necessary to override his constitutional right). These facts, coupled with the delay in informing Plaintiff of his arrest, prevent the Court from finding that Plaintiff was a pre-trial detainee and imputing the corresponding state interest to Defendant at this stage of the litigation.

Defendant also alleges that the state has an interest in providing medical care for incompetent individuals. However, for the reasons discussed above, the Court must accept that Plaintiff was competent at the time of treatment.

Because the facts, as pled by Plaintiff, do not implicate a state interest, the undersigned recommends the Court find that Plaintiff has stated a substantive due process claim for purposes of qualified immunity.

2. <u>Plaintiff has stated a plausible excessive force claim under the Fourth Amendment.</u>

Under the Fourth Amendment, a person has a right to be free from excessive force

when seized by a state actor. *Graham v. Connor*, 490 U.S. 386, 395 (1989). To bring an excessive force claim, a party must show "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Pena v. City of Rio Grande City*, 879 F.3d 613, 619 (5th Cir. 2018). The second and third elements of an excessive force claim are condensed into one objective-reasonableness inquiry. *Id*. When engaging in this objective-reasonableness inquiry, courts consider the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

As discussed above, *Heck* limits this Court's review to the force Defendant used after securing Plaintiff in handcuffs. Plaintiff alleges that after he was secured in handcuffs, Defendant continued to administer force in the form of holding him down on the stretcher in a prone position. [16] Dkt. No. 33 at 11. In applying the *Graham* factors, the undersigned finds that Defendant's force was unreasonable.[17]

Though Plaintiff had assaulted Defendant in the moments prior, Plaintiff alleges he

---

[16] As previously discussed, Plaintiff had a substantive due process right to refuse treatment. Therefore, the cases which suggest an officer may use force to compel an individual to receive medical treatment are not applicable. *See Stokes v. Porretto*, No. CIV.A. G-04-0596, 2006 WL 2844172, at *16 (S.D. Tex. Sept. 29, 2006) (noting that an officer may compel medical treatment where the patient is a pretrial detainee and the treatment is medically necessary); *Sullivan*, 384 F.3d at 378 (holding that force used to enable a nurse to administer medical treatment was not unconstitutional under the Fourth Amendment because, as a pretrial detainee, the plaintiff did not have a right to refuse medical treatment).

[17] Defendant does not argue that Plaintiff did not suffer injuries as a result of the use of force. *See* Dkt. Nos. 35, 41. The Plaintiff alleges that Defendant's continued use of force to hold him on to the stretcher caused him to sustain an injury to his rotator cuffs leading to pain that interrupted Plaintiff's sleep and limits the movement of his arms and hands. Dkt. No. 33 at 12. Further, Plaintiff alleges that the incident aggravated his post-traumatic stress disorder (PTSD) and his paranoid schizophrenia. *Id*.

was "immobilized" at the time Defendant was holding him down. *Id.*; *see Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009) (noting that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). In this forced prone position, Plaintiff was "unable to actively resist beyond moving his head" and contends that he no longer presented a danger to himself or others. Dkt. Nos. 40 at 18; 33 at 15; *see Timpa v. Dillard*, 20 F.4th 1020, 1030 (5th Cir. 2021) (finding a plaintiff who was "restrained, surrounded, and subdued" no longer posed an immediate threat of harm). Further, Plaintiff was unlikely to flee as he was waiting at the hospital for his son's arrival. *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (finding force unreasonable where there was no indication plaintiff would flee given that she was waiting on a family member to arrive at the scene).

Taking these above facts as true, the undersigned cannot find that Defendant's use of force after restraining Plaintiff was reasonable. Accordingly, the undersigned recommends that the Court find Plaintiff has stated a violation of his Fourth Amendment rights for purposes of qualified immunity.

    *b.  Plaintiff had a clearly established right to refuse medical treatment and to do so free of excessive force.*

The second prong of qualified immunity necessitates that a plaintiff show that their constitutional right was clearly established at the time it was violated. A constitutional right is clearly established "only if 'the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violated that right.'"

*Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018) (brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Ordinarily, a right becomes clearly established when existing precedent has "placed the statutory or constitutional question beyond debate." *Hanks v. Rogers*, 853 F.3d 738, 746–47 (5th Cir. 2017). A court must ensure that it does not "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. So, although the law does not require a case similar in every respect, clearly established law "must be particularized to the facts of the case." *Arzabala v. Weems*, No. 5:21-CV-00268-H, 2024 WL 1018530, at *5 (N.D. Tex. Mar. 8, 2024) (Hendrix, J.) (citing *White v. Pauly*, 580 U.S. 73, 79–80 (2017)).

And even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable under the circumstances. *See Jones v. Collins*, 132 F.3d 1048, 1052 (5th Cir. 1998).

1. <u>Plaintiff had a clearly established right to be free from unwanted medical care.</u>

Here, given the facts alleged, the question is whether there was legal precedent at the time of the incident to give Defendant fair warning that a competent individual who was temporarily seized by the state, had the right to refuse medical care for a non-life-threatening injury.

Courts have long held that a competent individual has the right to be free from unwanted medical procedures. *Cruzan,* 497 U.S. at 278–279. This right to bodily integrity extends to those seized by the state and "survives conviction and incarceration," *Brown v. Ionescu*, No. 02 CIV. 1218LMM, 2004 WL 2101962, at *4 (S.D.N.Y. Sept. 21, 2004)

(internal citations omitted); *Noble*, 87 F.3d at 161. As early as 1974, courts began to recognize that, absent a compelling state interest, the Fourteenth Amendment encompasses an individual's right to refuse treatment that is not medically necessary. *See Runnels v. Rosendale*, 499 F.2d 733, 735 (9th Cir. 1974) (holding a claim that an inmate was subject to an unwanted hemorrhoidectomy "may foreshadow proof of conduct violative of rights under the Fourteenth Amendment" absent a compelling state interest). In the fifty years since, case law has clearly established that an individual in state custody has a right to refuse medical treatment where that treatment is not necessary to preserve life or further a penological interest, "plac[ing] the constitutional question beyond debate." *Galvan v. Duffie*, 807 App'x 696, 697 (9th Cir. 2020).

Courts have recognized certain categories of state interests that are compelling enough to outweigh an inmate's liberty interest in refusing medical treatment. For example, case law has established that a state has a compelling interest in treating an inmate's condition where, if untreated, the inmate poses a danger to himself or others. *Washington v. Harper*, 494 U.S. 210, 227 (1990); *see Davis v. Agosto*, 89 Fed. Appx. 523, 528, 2004 WL 376833 (C.A.6 (Ky.)), at *6 (finding that the unwanted stapling of an inmate's head wound was not a constitutional violation because closing the wound was necessary to the health and safety of plaintiff and his peers). Similarly, courts have held that the state may force an inmate to treat his tuberculosis because it has a compelling interest in preventing the spread of a contagious and harmful disease. *McCormick v. Stadler*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004) (finding a pre-trial detainee's right to refuse medical treatment, here delousing shampoo, was outweighed

by the prison's interest in preventing the spread of lice to other inmates).

Further, courts have refused to find violations of substantive due process where the unwanted treatment was medically necessary to preserve the individual's life. *See U.S. v. Owens*, 475 F.2d 759, 760 (5th Cir. 1973) (finding no constitutional violation where the plaintiff's stomach was pumped without his consent because he was unconscious at the time and the procedure was ordered to prevent further harm to him); *Stokes v. Porretto*, No. CIV.A. g-04-0596, 2006 WL 2844172, at *15 (S.D. Tex. Sept. 29, 2006) (holding that ordering a doctor to pump the plaintiff's stomach against his will was not unconstitutional where the procedure was medically necessary). An inmate's right to refuse treatment may also be outweighed by the state's interest in assuring the medical stability of pretrial detainees. *See generally Sullivan*, 384 F.3d 372 (7th Cir. 2004) (granting qualified immunity where the officers forced a highly intoxicated pretrial detainee to undergo catheterization after the jail refused to admit him without medical clearance).

Absent a compelling state interest, courts have routinely held that an individual in state custody has the right to refuse medical treatment. For example, in *Brown v. Ionescu*, the court held that the prison's medical personnel violated the inmate's right to refuse treatment for purposes of summary judgment. No. 02 Civ. 1218LMM, 2004 WL 2101962, at *5 (S.D.N.Y. Sept. 21, 2004). In this case, the plaintiff was diagnosed with a kidney stone. *Id*. at *1. The prison doctor proposed surgical removal of the stone, during which he would place a ureteral stent. *Id*. The plaintiff alleged that he explicitly objected to the ureteral stent but the prison's medical doctor placed the stent regardless. *Id*. at *2. The court held that kidney stones were not the "type of health concern that would affect inmates

or prison guards" nor did the condition put plaintiff at risk of serious harm. *Id*. at *5. Accordingly, without the plaintiff's consent, the procedure was a violation of his Fourteenth Amendment. *Id*.

Further, the court in *Galvan* found existing precedent placed this constitutional question beyond debate. 807 F. App'x at 697. Jail officials in *Galvan* forced the plaintiff to undergo a tooth extraction despite the inmate's refusal. *Id*. Finding that the procedure was not required to avoid life-threatening injury or to advance the prison's penological interests, the court found the procedure violated plaintiff's constitutional right. *Id*. Further, given the status of case law at the time of the incident, the court held jail officials had fair notice that this conduct was unlawful and denied them qualified immunity. *Id*.

Similarly, the court in *Noble* denied qualified immunity to defendants at the summary judgment stage. 87 F.3d at 162. The plaintiff in *Noble* was involuntarily committed to a state hospital for his paranoid schizophrenia. *Id*. at 158. Plaintiff alleged that hospital personnel restrained and forcibly medicated him. *Id*. at 160. In pursuing this claim, plaintiff contended that the defendant provoked him to elicit a response which would warrant medicating him against his will. *Id*. The court held that no reasonable official would find this conduct constitutional and denied qualified immunity. *Id*.

In light of this existing law, the unlawfulness of Defendant's actions is apparent. Taking Plaintiff's well pleaded facts as true, Plaintiff was competent and therefore had the right to refuse treatment. Any argument Defendant has made to the contrary, even if the Court could consider it at this stage, is unpersuasive. Defendant may not now avail himself of the protections of *Heck* while simultaneously arguing, as he has done here, that he is

entitled to qualified immunity because "Plaintiff was not in any sort of condition at the time to make rational choices[.]" Dkt. No. 35 at 9. It is not logical to conclude that Defendant found Plaintiff competent enough to be charged with assault against a peace officer while refusing medical treatment, yet not competent enough to refuse in the first place.

Though the present facts are not identical to past legal precedent, the distinctions would not lead a reasonable officer to believe that Defendant's conduct was lawful. *See United States v. Lanier*, 520 U.S. 259, 269 (1997) (finding notable factual distinctions within the legal precedent do not prevent a finding of a clearly established right if those prior decisions gave reasonable warning that the conduct was unconstitutional). Unlike the plaintiffs in *Brown*, *Galvan* and *Noble*, Plaintiff was not in long-term custody but rather was temporarily seized by Defendant pending his son's arrival. Dkt. No. 33 at 10. This distinction gives Defendant more, not less, notice that his actions were unconstitutional as there were no penological interests implicated to outweigh Plaintiff's liberty interest. Further, Plaintiff states that his head injury was not life threatening, eliminating the possibility that Defendant acted out of medical necessity. *Id*. at 11. Therefore, the case law that existed at the time of the incident gave Defendant fair warning that forcing Plaintiff to undergo a medical procedure was unlawful.

2. Even in the absence of clearly established law, Defendant's actions were not objectively reasonable.

Although clearly established law indicates Plaintiff had a right to refuse medical care, the Court must still determine whether Defendant's actions were objectively

reasonable considering the law clearly established at the time of the violation. *Thompson*, 245 F.3d at 461.

Taking Plaintiff's factual pleadings as true, Defendant's actions were not reasonable. Plaintiff plausibly alleges the following narrative: Defendant ignored a competent individual's decision to forego medical care for a non-life-threatening injury and forcefully held him down while his skin was stapled shut against his will without any intention at the time to take him into long-term custody. Considering these allegations and the presumption of truthfulness the Court must give to them at this stage, the Court cannot find that these actions were objectively reasonable.[18]

The unreasonableness of Defendant's conduct is even more apparent considering the length of time he had to contemplate his conduct. Qualified immunity aims to protect officers from liability for "split-second decisions made without clear guidance from legal rulings." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009). Defendant's decision to force medical treatment on Plaintiff was not made in the heat of the moment or as a split-second decision. *See* Dkt. No. 33 at 4-12. The forced medical procedure was the culmination—if not ultimate goal—of Defendant's two-hour long encounter with the Plaintiff. *Id*. At approximately 5:30 p.m. Defendant arrived at Plaintiff's residence where he coaxed Plaintiff into going to the hospital. *Id*. at 5-6. At the hospital, Defendant

---

[18] The Court may also deny qualified immunity, even absent prior case law declaring such conduct unconstitutional, if the Plaintiff can show that the constitutional violation was so egregious that any reasonable officer would have been on notice as the lawfulness of their conduct. *Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020); *Thompson v. Upshur Cnty., TX*, 245 F.3d 447 (5th Cir. 2001). Although Plaintiff does not make this argument, his account demonstrates that Defendant's conduct was not only unreasonable but so egregious as to possibly invoke this "obvious case exception" to qualified immunity.

supervised Plaintiff with no other logical purpose but to get him medical treatment despite Plaintiff's repeated refusals. Up to this point, there is no reason to believe that Defendant's intentions and actions were anything other than honorable and in Plaintiff's best interest.

But in the hour that had passed between Plaintiff's arrival at the hospital and the completion of the procedure, Defendant had the opportunity to learn of and appreciate Plaintiff's insistence on not wanting treatment, and to re-evaluate the situation and question his course of action. *Compare Pasco*, 566 F.3d at 581 (finding qualified immunity applied partly because the officer "made a quick decision, under stressful circumstances" to bump a high-speed, erratic driver who was attempting to flee police custody off the road). This is particularly true given that Defendant knew Plaintiff's son was on the way. Accordingly, it was not reasonable for an officer, with this amount of time for deliberation, to conclude that forcing medical care onto Plaintiff was lawful.[19]

In his argument to the contrary, Defendant asserts that his behavior was reasonable because "allowing Plaintiff to leave and go and do whatever he wanted would have been a

---

[19] The cases Defendant uses to prove reasonableness are unpersuasive as they are distinguishably from the facts alleged. *Rich v. Palko* involved a plaintiff who suffered from "cerebral palsy, mental retardation, bipolar disorder, ADHD and epilepsy" and lived full time in an assisted living facility. 920 F.3d 288, 291 (5th Cir. 2019). This individual starkly differs from Plaintiff here who, as Defendant notes, was competent enough at the time of the treatment to be held criminally liable for his actions. *Rich* can further be distinguished as it did not involve unwanted medical treatment nor did the excessive force occur during the administration of treatment. *See generally* 920 F.3d 288. *Sims v. Griffin* is similarly inapplicable. 35 F.4th 945 (5th Cir. 2022). Though Defendant is correct that *Sims* reinforces an officer's obligation to provide medical care to pre-trial detainees under the Eighth Amendment, Plaintiff did not have that status here. Further, the plaintiff in *Sims* requested treatment and demonstrated symptoms indicating a serious condition for thirty-four hours with no assistance from prison officers. 35 F.4th at 950. In contrast, the Plaintiff here alleges he explicitly refused treatment multiple times over the course of two hours and did not exhibit a life-threatening injury. Accordingly, the duty an officer may have to provide medical care to pre-trial detainees who are requesting treatment and suffering from a life-threatening condition is of no help to Defendant based on the present facts.

violation of [Defendant's] obligations as a peace officer and could arguably constitute a violation of Plaintiff's constitutional right[.]" Dkt. No. 41 at 9.

Defendant's argument is not compelling considering the Fifth Circuit's holding in *Thompson v. Upshur County, TX.*, 245 F.3d 447 (5th Cir. 2001). In *Thompson*, the plaintiffs brought a §1983 action on behalf of their son, who died of delirium tremens (DTs) while incarcerated. *Id*. The plaintiff first began to exhibit symptoms while in the temporary custody of Marion County Jail (Marion). [20] *Id*. at 452-53. Marion staff called an ambulance but, despite the EMTs' attempts to convince him otherwise, the plaintiff refused medical treatment. *Id*. at 453. Staff respected the plaintiff's right to refuse and transferred him into the care of Upshur County Jail, a facility better equipped to supervise plaintiff's condition. *Id*. The Fifth Circuit held it was objectively reasonable for Marion staff not to compel medical treatment given the temporary nature of their custody over plaintiff and plaintiff's repeated refusals, even though plaintiff was hallucinating and disoriented at the time. *Id*. at 461-62. Under these circumstances, Marion staff had no duty to impose medical treatment on the plaintiff. [21] *See id*. at 461 ("At virtually the first sign of a serious threat to [plaintiff's] health, [Marion staff] summoned an ambulance and shortly thereafter transferred [plaintiff]

[20] Plaintiff was first brought to Upshur County jail but, due to overcrowding, was transferred to Marion for approximately two days. *Thompson*, 245 F.3d at 452-53. The plaintiff's hallucinated to the extent he "saw snakes coming out of the walls, requested a screwdriver so he could build a house, and believed he was at a barbecue in Gladewater, Texas." *Id*. at 453.

[21] In support of its conclusion, the *Thompson* court cites state statutes which limit the situations in which a state actor is required to search for a surrogate decision maker or impose medical treatment against an individual's will. *See* 245 F.3d at 461 (citing TEX. HEALTH & SAFETY CODE ANN. § 313.004 (West 2000)) (requiring a search for a surrogate for adult hospital patients who are "comatose, incapacitated, or otherwise mentally or physically incapable of communication....") (citing TEX. HEALTH & SAFETY CODE ANN. § 551.041 (West 2000)) (requiring the state actor to obtain the consent of three licensed physicians before imposing unwanted medical care on a patient in a mental institution).

to a jail that she believed would provide closer supervision. Clearly established law required no more.").

Like *Thompson*, Plaintiff repeatedly and calmly refused medical care prior to the procedure. Further, similar to *Marion* staff, Defendant only intended to have short-term custody of Plaintiff. At the time of the forced procedure, the Defendant was aware that Plaintiff's son was on his way to the hospital, and only seized him in the interim. As noted in *Thompson*, the law required Defendant to summon medical help and arrange for Plaintiff's long-term supervision, but not go so far as to subject him to unwanted medical care. *See* 245 F.3d at 461. Accordingly, the Court is not persuaded by Defendant's attempt to justify the reasonableness of his conduct on the grounds that they were constitutionally required.

For these reasons, the undersigned RECOMMENDS the Court DENY Defendant's motion to dismiss Plaintiff's substantive due process claim on qualified immunity grounds.

3.  Plaintiff had a clearly established right to be free from excessive force.

For purposes of qualified immunity, the Court must determine whether it was clearly established that Plaintiff, after Defendant restrained him, had a right to be free from excessive force when refusing medical treatment.

In 1989, The Supreme Court established that the use of force must be proportionate to the circumstances. *Graham*, 490 U.S. at 396. Since *Graham*, courts have specifically held that it is not reasonable for an officer to continue to use force after the suspect has stopped resisting. *See, e.g.*, *Bush*, 513 F.3d at 502 (denying qualified immunity because the officer had fair warning that slamming the plaintiff's face into a vehicle after she had been

restrained and subdued was unconstitutional); *Timpa*, 20 F.4th at 1038 (holding that, since 2016 it has been clearly established that "the continued use of force against a restrained and subdued subject" constitutes excessive force); *Darden*, 880 F.3d at 733 (holding that the "law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting.").

Case law has made it clear that where the individual is not compliant but is otherwise not attempting to fight or flee, the immediate use of physical force "without attempting to use physical skill, negotiation, or even commands" is unreasonable. *See Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (finding use of force was not protected under qualified immunity because, even though the plaintiff struggled while officers held him against the vehicle, there was no evidence he was attempting to fight or flee); *Deville*, 567 F.3d at 169 (denying qualified immunity where the officers resorted to force in response to passive resistance without first engaging in negotiation).

An individual continues to have a right to be free of excessive force even where that force is used in the context of a medical procedure. *See Callaway v. City of Austin*, No. A-15-CV-00103-SS, 2015 WL 4323174, at *12-14 (W.D. Tex. July 14, 2015) (denying qualified immunity to an officer who pushed down on plaintiff's already restrained arm with his hands, bodyweight, and boot as plaintiff had her blood drawn)*; Stokes*, 2006 U.S. Dist. LEXIS 71060, at *49-50 (S.D.Tex. Sept. 29, 2006) (denying qualified immunity to an officer who pressed his knees into plaintiff's chest and groin as well as squeezed his genitals in attempts to get him to comply with a medical procedure).

Given the body of case law at the time of the incident, Defendant had notice that

continuing to hold Plaintiff down on the stretcher after he was immobilized constituted excessive force. Like the plaintiffs in *Bush*, *Timpa* and *Darden*, Plaintiff alleges that he was restrained as Defendant had placed him in handcuffs. Dkt. No. 33 at 11. Additionally, like the plaintiff in *Deville*, there was no risk of Plaintiff fleeing because he was relying on his son to pick him up. *Id*. at 10; *see* 567 F.3d at 169 (noting there was no indication plaintiff posed a risk of fleeing because she was waiting for her husband to arrive at the scene, and she informed the officers of that fact). Defendant was aware of this fact, as he contacted the son himself and requested he retrieve Plaintiff. Dkt. No. 33 at 9. Further, although Plaintiff may have not been willing to comply with the anticipated medical procedure, Defendant was not reasonable in resorting immediately to force when Plaintiff's life was not in danger. *See Deville*, 567 F.3d at 169; *Callaway*, 2015 WL 4323174, at *12-14 (W.D. Tex. July 14, 2015).

Despite the *Graham* factors clearly establishing Plaintiff's right to be free of excessive force in these circumstances, the Court must still determine whether Defendant's actions were objectively reasonable. *Thompson*, 245 F.3d at 461. Defendant's only justification for holding Plaintiff down on the stretcher was for purposes of medical treatment and evaluation. Dkt. No. 35 at 9. As discussed above, Plaintiff had a right to and actively did refuse that treatment. Defendant does not offer any justification as to why, despite this well-established right, his use of force was reasonable in the present case and this Court can find none. See Dkt. Nos. 35, 41.

Accordingly, Plaintiff had a clearly established right to be free of force as he was restrained, unlikely to flee, and Defendant had not engaged in an alternative, nonviolent,

attempts to keep Plaintiff on the stretcher prior to resorting to force. Therefore, the undersigned RECOMMENDS the Court DENY Defendant's motion to dismiss Plaintiff's excessive force claim on qualified immunity grounds.

III.    Texas Tort Claims Act bars Plaintiff's state assault claim.

The Texas Tort Claims Act (TTCA) provides a limited waiver of governmental immunity for certain lawsuits against government entities. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008) (citing TEX. CIV. PRAC. & REM. CODE §101.023). Under the Act's election-of-remedies provision, a plaintiff may choose to bring a civil suit against either the government employee or their employing government entity but not both.[22] *Tipps v. McCraw*, 945 F.Supp. 2d 761, 765-66 (W.D. Tex. 2013). However, if the plaintiff is suing the government employee in their official capacity, the plaintiff can only sue the government entity and is barred from filing a suit against the individual employee. TEX. CIV. PRAC. & REM. CODE §101.106(f). A government employee is sued in their official capacity when the suit (1) is based on conduct within the scope of the defendant's employment with the government and (2) the suit could have been brought against the government entity under the Act. *Tipps*, 945 F.Supp. 2d at 766. The Act strongly favors dismissal of suits against government employees. *Id*.

On the employee's motion, a court must dismiss the suit if it finds that it was brought against the individual in their official capacity unless the plaintiff has filed an amended

---

[22] TTCA's election of remedies provision applies to both intentional and non-intentional torts, despite the Act exempting certain intentional torts. *Chavez v. Alvarado*, 550 F.Supp.3d 439, 451, 454 (S.D. Tex. 2021).

complaint within thirty days of the employee's motion, substituting the employing government entity for the employee. TEX. CIV. PRAC. & REM. CODE §101.106(f).

> a. *Defendant was acting within the scope of his employment when the assault occurred.*

An employee acts within the scope of their employment when they are discharging the duties generally assigned to them. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994). Specifically, the Act includes any "performance for a governmental unit of the duties of an employee's office or employment and includes being in and about the performance of a task lawfully assigned to an employee by competent authority" within the scope of employment. TEX. CIV. PRAC. & REM. CODE §101.106(f)). Alternatively, an employee is not acting within the scope of their employment when their conduct is "within an independent course of conduct not intended by the employee to serve *any* purposes of the employer." *Id*. (emphasis added).

The employee's state of mind, motives, and competency are not relevant to the scope-of-employment analysis nor are courts to "pass judgment on the police officer's skill or the manner in which he attempted to enforce the law[.]" *Smith v. Heap*, 31 F.4th 905, 913 (5th Cir. 2022); *Garza v. Harrison*, 574 S.W.3d 389, 401 (Tex. 2019). Rather the "critical inquiry is whether, when viewed objectively, 'a connection exists between the employee's job duties and the alleged tortious conduct.'" *Garza*, 574 S.W.3d at 401 (citing *Laverie v. Wetherbe*, 517 S.W.3d 748, 753 (Tex. 2017)).

In determining whether Plaintiff's assault suit falls within Defendant's scope of employment, it is first necessary for the Court to review what remains of Plaintiff's claim.

34

As discussed above, *Heck* prevents this Court from finding that Defendant's actions prior to, and including, securing Plaintiff in handcuffs was anything but lawful.[23] Accordingly, the assault claim is limited to Defendant's continued use of force after placing Plaintiff in handcuffs.

Defendant argues that Plaintiff's §1983 claim in the present suit, which requires the defendant to have been acting under the color of state law, constitutes a stipulation that he was acting within the scope of his employment as a peace officer at the time of the assault. Dkt. No. 35 at 11. However, §1983 claims exist independent of the TTCA and courts have allowed plaintiffs to plead both simultaneously. *Donahue v. Dominguez*, 486 S.W.3d 50, 56 (Tex. App. 2016); *see generally Tipps*, 945 F. Supp. 2d at 761 (dismissing a state tort claim, brought alongside a §1983 claim, after determining the conduct fell within the scope of employment not merely because it accompanied a §1983 claim).

Defendant further contends that he was acting within the scope of his employment, noting that "[h]e was in uniform and identified himself as a police officer" and was on duty at the time of the assault. Dkt. No. 41 at 8. But whether the Defendant "looked the part" or was on duty does not determine whether his conduct falls within the scope of his employment. *Garza*, 574 S.W.3d at 403, 404 (holding that an off-duty officer in plain clothes was acting within the scope of his employment because "mere objective indicia of official capacity" does not establish scope of employment as a matter of law).

---

[23] The doctrine articulated in *Heck* applies to bar state law claims that would otherwise undermine a conviction. *Darnell v. Sabo*, No. 4:19-CV-871-O, 2022 WL 16577866, at *5 (N.D. Tex. Nov. 1, 2022).

Defendant argues that he applied this force in accordance with his authority to restrain Plaintiff in response to Plaintiff's assault.[24] A peace officer has a duty to prevent a person from committing an offense against another person when such conduct occurs in the officer's presence. *Garza*, 574 S.W.3d at 402 (citing Tex. Code Crim. Proc. Ann. art. 6.06 (West)). Here, Plaintiff bit Defendant and, in response, Defendant placed him in handcuffs and applied his body weight to keep him face-down on the stretcher. Dkt No. 33 at 10-11. The Court may not consider Defendant's motives nor evaluate the manner in which he carried out this duty.[25] *See Smith*, 31 F.4th at 913. Rather, when looking at the conduct objectively, there is a sufficient nexus between Defendant's duty to prevent injury and the conduct underlying Plaintiff's assault claim.

Plaintiff alleges that Defendant held him down not to prevent further injury but to subject him to an unwanted medical procedure. Dkt. No. 40 at 30. Though this may be true, it does not warrant a finding that Defendant was acting outside the scope of his employment for purposes of the TTCA. *See Anderson v. Bessman*, 365 S.W.3d 119, 126-26 (Tex. App.

---

[24] As this Court noted in its judicial screening order, Defendant was likely acting under § 573.001-03 when he seized Plaintiff. Dkt. No. 23 at 16. Under this section, an officer may apprehend an individual "if (1) the officer has reason to believe and does believe that a person is mentally ill and because of that illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody." *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) (citing Tex. Health & Safety Code § 573.001). However, at the time of the assault, Defendant had accomplished this duty. Prior to the incident, Plaintiff calmly remained in the vestibular and he waited for his son to arrive without objection. Therefore, the force underlying Plaintiff's assault claim was likely not administered to maintain or effectuate this seizure.

[25] The finding that Defendant's behavior underlying the assault charge was within his duty to prevent future injury does not contradict the finding that the same conduct constitutes excessive force. The scope of employment analysis does not invite the court to assess whether the employee's actions were proper but rather whether they were connected to a statutory duty. *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 425-26 (finding that the state employees acted within the scope of their employment when revoking a building permit, despite a court's later determination that the revocation was incorrect, because the statute provided the employees authority to revoke).

2011) ("So long as it falls within the duties assigned, an employee's conduct is 'within the scope of employment,' even if done to serve the purposes of the employee or a third person."); *Donahue*, 486 S.W.3d at 57 (finding conduct within the scope of employment absent an allegation that the conduct did not serve *any* purpose of the police department *and only* furthered employee's independent motives).

In his argument to the contrary, Plaintiff contends that Defendant was not acting within the scope of his employment because he administered force in bad faith. Dkt. No. 40 at 24. Though the presence of bad faith may be relevant to an official immunity analysis, it is not relevant to the Court's inquiry under statutory immunity. *See Tipps*, 945 F. Supp. 2d at 767 (finding the plaintiff's bad faith argument demonstrates that she "conflates official immunity with the statutory immunity provided by" the TTCA). Under the TTCA, the Court cannot consider Defendant's subjective motive when determining whether his conduct fell within the scope of his employment and so, Plaintiff's argument is unpersuasive. *See Smith*, 31 F.4th at 913.

> b. *Plaintiff could have brought this claim against Brownwood Police Department.*

The Court must next determine whether Plaintiff could have brought his assault claim under the Act against Defendant's employer, here, the Brownwood Police Department. The Act only waives liability for certain actions and excludes common-law intention torts such as "false imprisonment, assault and aggravated assault[.]" *Donohue*, 486 S.W.3d at 55. However, when assessing whether a plaintiff could have brought the claim against the government entity under the TTCA, the Court does not need to find that

37

the suit would have ultimately been successful. *Tipps*, 945 945 F. Supp. 2d at 768. Thus, Plaintiff could have brought this claim against Brownwood Police Department for purposes of this provision, even though the Act does not ultimately allow a plaintiff to bring an assault claim against a government entity. *See id*.

Because the undersigned finds that Plaintiff's assault claim is brought against Defendant in his official capacity, the Plaintiff can only avoid dismissal if she had amended her pleadings within thirty days of Defendant's Motion. *See* TEX. CIV. PRAC. & REM. CODE §101.106(f). Considering that the thirty-day deadline has expired without Plaintiff doing so, TTCA requires dismissal of her assault claim. *See Donahue*, 486 S.W.3d at 57.

Accordingly, the undersigned RECOMMENDS that the Court GRANT Defendant's Motion and DISMISS Plaintiff's assault claim consistent with the Texas Tort Claims Act.

## V.    CONCLUSION

For the reasons explained above, the undersigned RECOMMENDS that the Court GRANT Defendant's Motion regarding Plaintiff's excessive force claims as it relates to Defendant's conduct prior to and including handcuffing Plaintiff. Further, the undersigned RECOMMENDS that the Court GRANT Defendant's Motion and DISMISS Plaintiff's state assault claim because it is barred under the Texas Tort Claims Act. The undersigned RECOMMENDS that the Court DENY Defendant's Motion to dismiss Plaintiff's substantive due process claim and his remaining excessive force claim as qualified immunity does not apply.

## VI.    RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on

38

all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## VII.   TRANSFER OF CASE

Because the parties have not consented to the undersigned exercising the full jurisdiction of this Court, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 6:22-CV-00034-H.

ORDERED this 10th day of January 2025.

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE

39