UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

ROBERT C. WALKER,
Institutional ID No. 02384194

Plaintiff,

v.

ZACHARY DAVIS,

Defendant.

No. 6:22-CV-00034-H

**OPINION AND ORDER**

Plaintiff Robert C. Walker sues Officer Zachary Davis for excessive use of force and forced medical care after what began as a welfare check ended with Plaintiff's arrest. Defendant now moves for summary judgment on the issue of qualified immunity with a supportive brief and appendix. Dkt. Nos. 65, 66, 67, 68, 74. Plaintiff responded with his own supportive brief and appendix. Dkt. Nos. 70, 71, 72, 75. Defendant filed a reply, Dkt. No. 78, and Plaintiff filed a sur-reply, Dkt. No. 81. The matter is fully briefed and ripe for review.

Two narrow questions remain: whether Defendant used excessive force against Plaintiff after he was secured in handcuffs, and whether he facilitated unwanted and unnecessary medical treatment—stapling Plaintiff's open head wound—in violation of Plaintiff's right to refuse medical care. The competent summary judgment evidence, which includes video footage of the entire transaction from Defendant Davis's body-worn camera, conclusively answers these questions in the negative. As a result, the Court finds that Defendant Davis is entitled to qualified immunity and grants his motion for summary judgment.

## 1. Background and Plaintiff's claims

Plaintiff was diagnosed with paranoid schizophrenia in 2020. Dkt. No. 33 at 4. Brownwood Police Department (BPD) officers, including Defendant Davis, were familiar with

Plaintiff and his diagnosis because he frequently called them for help during episodes of paranoia. *Id.* at 5.

Plaintiff asserts that on April 27, 2021, an unknown intruder broke into his home and struck him on the head, causing a cut on his forehead. He contends that the intruder fled, leaving behind drug paraphernalia (two glass pipes) and a Playboy magazine. *Id.* at 6. He alleges that after the attack, he moved to his front porch to sit with his dog, hoping that the fresh air would help calm his nerves. Dkt. No. 75 at 6. A neighbor saw him bleeding and called BPD to check on him. Plaintiff claims that Defendant Davis and another BPD officer showed up right as he was about to go inside to treat his wound. *Id.* at 7. He asked them to go away because he did not need help. But he was placed in handcuffs, forced onto a stretcher, and put into an ambulance. The handcuffs were removed, and he was transported to the Brownwood Emergency Room. During the ride, he refused all medical treatment, including having his vitals and blood pressure checked. Once he arrived at the hospital, he consistently refused all medical treatment and sat calmly on a stretcher in the hallway, waiting for his son to pick him up and take him home. *Id.* at 8.

After a while, even though he had repeatedly declined medical treatment, staff began to push Plaintiff's stretcher into a treatment room, and his protests became more urgent. He tried to get up and leave, but Defendant Davis forced him back onto the stretcher. He "explicitly indicated" that he did not want treatment and tried again to stand up and leave. *Id.* This time, Defendant Davis violently forced him back down onto the stretcher, and he struggled against Defendant Davis, biting him in the process. *Id.* at 8–9. Davis then forcibly turned him over onto his stomach, with his head hanging off the side of the stretcher and placed him in handcuffs.

This is where Plaintiff's live claims begin.[1] He asserts that Davis called him derogatory names and violently yanked him back onto the stretcher while his arms were handcuffed behind his back. *Id.* at 9. He claims that he screamed in pain as Defendant Davis's forceful action injured both of his rotator cuffs. Then, staff began to clean his head wound. But the sterilization fluid dislodged the dried blood from his face, and rehydrated it, causing it to pool on the floor. When Plaintiff saw what appeared to be fresh blood dripping to the floor, he believed that the medical providers were killing him by cutting off his head. Then, a doctor stapled his wound closed without his consent. Plaintiff contends that "throughout the procedure, Davis continued to press [him] forcefully onto the stretcher notwithstanding that [he] was already immobilized in handcuffs." Dkt. No. 33 at 11. Plaintiff asserts that he was later discharged without any need for after care, which confirms that his wound was "superficial" and there was no need for force or treatment. Dkt. No. 75 at 10.

In sum, Plaintiff claims that Defendant Davis used excessive force in pulling him onto the stretcher after he was handcuffed and facilitated his forced and unnecessary medical treatment despite his refusal. He asserts that Davis's force caused lasting physical and emotional injuries, and he seeks monetary relief.

## 2. Defendant's Motion

Defendant argues that he is entitled to qualified immunity because he did not violate Plaintiff's constitutional rights, and his actions were reasonable in light of clearly established law. Dkt. No. 66. Specifically, he argues that the videos show that after he handcuffed

---

[1] The Court previously determined that Plaintiff's claims related to Defendant Davis's conduct leading up to and including handcuffing Plaintiff during his arrest were barred under *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). *See* Dkt. Nos. 44, 48. Plaintiff was charged with, pled guilty to, and was convicted of assault on a public servant for biting Defendant Davis. *See* Dkt. No. 44 at 5. He also pled guilty to possession of a controlled substance based on the glass pipes that he alleges were left behind by the intruder. *Id.* He had the pipes in his pocket during the encounter and volunteered them to the defendant after his arrest. *Id.*

Plaintiff, he stepped away from the gurney, and medical personnel took over. He did not use any force after Plaintiff was handcuffed, nor did he physically restrain him while he was being treated. He also contends that he did not direct, order, or request that the medical providers treat Plaintiff. Finally, he asserts that even if any of his actions violated Plaintiff's rights, those rights were not clearly established at the time.

In support of his motion, Defendant offers the following summary judgment evidence:

A. Arrest report with business records affidavit;
B. Art Shannon's body-worn camera video (Video 1);
C. James Wells's body-worn camera video (Video 2);
D. James Wells's backseat camera video (Video 3);
E. James Wells's front dash camera video (Video 4);
F. James Wells's front dash camera video, second angle (Video 5);
G. Zachary Davis's body-worn camera video part one (Video 6);
H. Zachary Davis's body-worn camera video part two (Video 7);
I. Zachary Davis's backseat camera video part one (Video 8);
J. Zachary Davis's backseat camera video part two (Video 9);
K. Zachary Davis's front dash camera video (Video 10);
L. Zachary Davis's backseat camera video second angle (Video 11); and
M. Zachary Davis's backseat camera video second angle part two (Video 12);

The summary judgment evidence supports Defendants' version of the facts as follows:

Defendant was dispatched to Plaintiff's house after one of Plaintiff's neighbors observed him outside on the front porch with "blood everywhere" and reported that he may have harmed himself. Dkt. No. 74 at 7. Defendant arrived and observed Plaintiff laying on his front porch with his dog, bleeding severely from his forehead. *Id.* Defendant approached the house, addressed Plaintiff by name and asked him what was going on. Davis BWC1 at 1:25–30. Plaintiff responded, "I want some help," but then told Defendant to stay back and to just send him an ambulance. *Id.* at 1:30–40. Defendant paused at the end of Plaintiff's driveway and spoke into his radio, advising that Plaintiff did not want him to approach but did want an ambulance and noting that "he is bleeding pretty heavy." *Id.* at 1:50–58. After some back and

forth, Plaintiff added that "it better be a real ambulance." *Id.* at 2:27. Plaintiff then began to ask for some water. *Id.* at 2:40.

Another BPD Officer, James Wells, arrived and began to approach the house from the opposite side of the front yard. *See* Wells BWC at 1:15–30. Meanwhile, Defendant moved closer to the house and asked Plaintiff what happened to his head. Davis BWC1 at 2:57. Plaintiff said, "neither one of them are police vehicles, man," and Defendant assured him that they were real. Davis BWC1 at 3:00–15. Defendant again asked Plaintiff what happened to his head, but Plaintiff told Defendant and Wells to "stay back" and threatened to "throw this dog shit on [them]." Wells BWC at 1:30; Davis BWC1 at 3:25. Plaintiff was sitting in a pile of trash, holding his dog in his lap. Dkt. No. 74 at 7. He told the officers that he was "already dying," and he just wanted a drink of water. Davis BWC1 at 3:30. He told the officers "you know where I'm going," and explained that he needed a drink of water because he was going to "Woodlawn. The cemetery." *Id.* at 3:40–55. As the officers slowly closed in on the porch, Plaintiff began to panic, threatened to "make a scene," and said, "I know what y'all are gonna do, you're gonna shoot me and kill me right now." *Id.* at 4:02–08. He tightened his grip on his dog and began to scream, repeating "Help!" and "They're gonna kill me!" and "They're not even cops! They're not even cops!" *Id.* at 4:08–44. He continued pleading for a drink of water and wailing, "I know you're gonna shoot me in the head," and "I'm already dying." *Id.* at 4:44–58.

Based on the nature of Plaintiff's statements and behavior, Defendant believed that Plaintiff was under the influence of methamphetamine. Dkt. No. 74 at 7. As he got closer, Defendant could see that Plaintiff had a gash on his forehead "approximately the vertical length of a silver dollar." *Id.* Given Plaintiff's apparent state of mind and erratic behavior, the officers decided to place him in handcuffs for their safety and the safety of responding EMS personnel.

*Id.* The officers secured Plaintiff's hands behind his back and assisted him to sit on the front steps. Plaintiff was wearing a basketball jersey with his head through one of the arm holes, a pair of jeans with one pants leg ripped up to his thigh, with one bare foot and the other wearing a cowboy boot. Davis BWC1 at 5:19–35.

Almost immediately after Plaintiff was handcuffed, BPD Sgt. Shannon arrived on scene, followed immediately by EMS and Fire Department personnel. Plaintiff again asked for a drink of water. *Id.* at 5:40. Plaintiff suddenly calmed down and told Officer Wells, "I know everything, man . . . but I ain't gonna say nothing, just give me some water, y'all." Wells BWC 4:05–11. He looked in the direction of the emergency response vehicles and said, "I know what that is . . . I know that's a hole-digger thing, ok, but I'm not gonna say nothing, man, if y'all give me something to drink." *Id.* at 4:18–24. EMS began to evaluate Plaintiff, and one of the officers asked him again how he got the gash on his head. *Id.* at 6:20. Plaintiff claimed that he fell. *Id.* at 6:24. Officer Wells explained to EMS that Plaintiff had "some MHMR issues going on, too." *Id.* at 6:38–41. One of the paramedics gave Plaintiff some water, then struck a deal with Plaintiff that if he would go with them to the hospital to get his head treated, they would get him some more water.

The officers and paramedics moved Plaintiff to a stretcher, and Plaintiff continued making delusional statements, telling the officers they "shot [him] through, in the house," that Defendant Davis was cutting his head off, and that he knew "I'm done with . . . I'm over." Davis BWC1 at 10:40; 11.05; 11:46.

One of the paramedics told Plaintiff, "I want you to understand you have a major gash in your head, like I can see your skull." *Id.* at 10:37. Plaintiff insisted that the officers or paramedics shot him through the shoulder and "all the blood is running down my back now." *Id.* at 12:13–30. The paramedics secured the seatbelts on the stretcher and told Plaintiff they

were taking him to the ER to get his head seen by a doctor, but Plaintiff accused them of lying. *Id.* at 12:30–40. Sgt. Shannon explained to Plaintiff, "you split your head open, you have to have stitches, no doubt about it, one way or the other." *Id.* at 12.42–55. Plaintiff's handcuffs were removed, and he rode to the hospital in the ambulance. *See id.* at 18:00–20; Dkt. No. 74 at 8. Defendant Davis followed the ambulance in his patrol vehicle "to ensure Walker's demeanor did not re-escalate." Dkt. No. 74 at 8.

When Plaintiff arrived at the hospital, the paramedics paused briefly with his stretcher in the vestibule area before entering the emergency room. Plaintiff began yelling, "come on man, get me in there! Its an emergency, right? How come I'm not in there getting taken care of? Well, fuck. Hey! You're letting me die here! You're letting me die out here in the emergency room! I should already be seeing a doctor!" Davis BWC2 at 00:30–50. As the paramedics tried to talk to him, he yelled even louder "Why ain't I in there? Take me in there! With a doctor! I'm gonna die right here man, you're letting me bleed out right here instead of taking me in to see the doctor!" *Id.* at 00:52–1:15. The paramedics wheeled him into the emergency department and parked his stretcher in the hallway near the intake desk. Meanwhile, Defendant Davis stopped to get Plaintiff checked in and summarized the situation for Dr. Okoro. *Id.* at 2:10–3:05.

In the background, the paramedics and firemen asked Plaintiff to move from the EMS stretcher to a hospital bed so the doctor could examine his head wound. Plaintiff loudly asked "bandage up my head? What about the holes in my chest? And my back? And my wrists?" *Id.* at 3:21–30. As he shifted onto the hospital bed, Plaintiff asked "What is that? Why is there a gun in there?" and the staff around him assured him there was not a gun in the bed. *Id.* at 5:01–04. Then, when the staff pulled the side rail up on the hospital bed, he screamed out "See? This

is a casket!" *Id.* at 5:20. So they lowered the rail back down. *Id.* at 5:26. A minute later, he looked around and declared, "this is the funeral home." *Id.* at 6:40.

Dr. Okoro came over and told Plaintiff, "I'm the doctor, I'm here to help you," and Plaintiff responded, "I know" and asked Dr. Okoro to step back. *Id.* at 6:40–55. Then he told Dr. Okoro, "look man, I'm bleeding out." *Id.* at 6:57. Dr. Okoro explained that he needed to shine a light in Plaintiff's eyes, but Plaintiff refused, saying "I know what you're gonna do, you're gonna shoot me through the fucking eye." *Id.* at 7:00–29. A nurse approached him to take his blood pressure, but he refused to cooperate, telling her "I know you're Jessica's mom." She said she was not Jessica's mom and explained that she needed to take his blood pressure, but he declined. A few moments later, when Dr. Okoro asked Plaintiff if his son knew he was at the hospital, Plaintiff pointed back in the direction of the nurse and said, "one of Jessica's friends told me I was going to Woodlawn Cemetery."

Dr. Okoro and Defendant tried to refocus Plaintiff by reminding him that he was at the hospital to get help for his head. Plaintiff told them they were wrong and that his head was not bleeding, but he could feel that his back and his side were bleeding. *Id.* at 9:57–10:02. Defendant Davis reminded Plaintiff of his head injury and asked him, "can you let them help you?" and Plaintiff agreed, "yes, in just a minute." *Id.* at 10:05–14.

While they waited for an exam room to open up, Defendant Davis walked away and talked to a paramedic, giving him more background about Plaintiff and the situation as he appeared to be drafting a report. *Id.* at 11:50–19:00. When Davis turned back toward Plaintiff, he was flipping through a playboy magazine that he had brought with him in his boot. *Id.* at 19:15–40. He held up the magazine and explained that it was evidence his friends sent him, and "its got more than that. The papers and everything of everybody in here of what was going to happen to me . . . its got everything." *Id.* at 20:11–17.

Then Plaintiff asked, "What are y'all gonna do? Y'all gonna save me and I stop them from everybody getting caught or let me die and everybody get caught." *Id.* at 21:14–22. Defendant explained they were trying to save him. *Id.* at 21:22. But Plaintiff responded, "No you're not man. You're fixin' to harvest my body parts. Everybody already told me man." *Id.* at 21:23. He held up the magazine again and said, "Lookie there. There's an article on everyone. A little article on every one of y'all involved. Everyone. If you don't believe me, the proof is right here." *Id.* at 21:51–22:03. Someone asked Plaintiff if he was going to let the doctor check him out, and he said "No, I don't want anybody touching me." *Id.* at 22:15–10. Plaintiff continued reading the names and titles from the Playboy magazine.

Defendant mentioned that Plaintiff's son was on his way and Plaintiff replied, "No he ain't." *Id.* at 25:50-51. Defendant stepped away and made a call to his Sergeant to report on the situation, including that Plaintiff would not let the doctor get close enough to examine or treat him. After completing the call, Defendant contacted dispatch over his radio and asked them to have MHMR give him a call. *Id.* at 28:24–37. Plaintiff got irritated and raised his voice at someone mentioning her husband, yelling "Husband? You're a liar! I ain't your husband! I have no wife. My name is Robert Walker and I have no wife!" Dr. Okoro stood up and told Plaintiff that if he did not calm down, he would have to sedate him. *Id.*, at 29:09–19.

Once an exam room opened up, paramedics and hospital staff began to talk to Plaintiff about moving out of the hallway. At first, Plaintiff stayed quiet and seemed to think about it. *See id.* at 30:45–33:20. They explained that they needed to take him into a room so the doctor could look at his head without people gawking at him, and they promised him that once he let the doctor look at him, he could have some more water to drink. *Id.* Plaintiff appeared to be uncomfortable and started to shift his weight around as he sat on the edge of the bed. Then,

when he was asked if he could move into the room, he replied "no." *Id.* at 33.:27–33. The staff explained that he didn't need to get up; they would just move his bed.

They began preparing his bed to move, and a paramedic asked if he was ready, but he said, "no sir." *Id.* at 34:26. Plaintiff became more agitated and declared that he wanted to stay in the hallway, because "y'all are gonna kill me in there, man." *Id.* at 34:36. The paramedics assured him that they were not going to kill him, but Plaintiff argued with them. *Id.* at 34:38. As they started to move the bed, Plaintiff raised his voice: "y'all are going to kill me man, I know what this room is for, . . . that's the death room. Yeah, it is. It's where you take me to k-- look man." *Id.* at 34:40–59. Hospital staff brought Plaintiff a cup of water, which he refused, telling them "I don't trust that shit, man." *Id.* at 35:00–05. He remained agitated and accused the staff of bringing him cloths soaked in urine. Then he reminded them that he asked for water.

As the paramedics and staff rolled the bed closer to the exam room, Plaintiff began shouting "hey!" and "please, man!" and rocking his body back and forth. *Id.* at 35:17–25. Defendant put his hand on Plaintiff's shoulder and told him to stay seated. *Id.* When the bed reached the doorway of the room, Plaintiff yelled "No! Uh-uh!" and jumped up toward Defendant, who put his hands out to block him. *Id.* at 35:25–31. Plaintiff fought against Defendant in the crowded hallway among hospital equipment, staff, and paramedics. *Id.* at 35:26. During the brief struggle, Plaintiff bit Defendant's arm, and Defendant shouted, "Don't you fuckin' bite me." *Id.* at 35:30. Plaintiff cried out, "I'm trying to save y'all, I'm trying to save y'all" and then wailed as he continued to struggle against the paramedics and the Defendant's efforts to handcuff him. *Id.* at 35:35–36:50.

As soon as the handcuffs were applied, Plaintiff began to pray loudly. *Id.* at 36:50. Defendant lifted his arm, looked at where Plaintiff bit him, and said, "fucker." At this point,

Plaintiff was lying on his stomach across the foot of the hospital bed with his head and shoulders hanging over the edge and his hands cuffed behind his back. *Id.* Dr. Okoro was standing next to him, holding his head and applying a solution to his forehead. Defendant Davis muttered "piece of shit," then lifted plaintiff back onto the bed with the help of one of the paramedics, so that Plaintiff was lying on his right side with his head aligned with the head of the bed. *Id.* at 37:00. As they moved him, Plaintiff began to yell again, but Defendant told him to shut up. Dr. Okoro continued to apply the solution to Plaintiff's forehead. *Id.* Defendant Davis immediately stepped back and began to inspect his arm where Plaintiff bit him. *Id.* at 37:05. Plaintiff went back to praying aloud. *Id.* at 37:07.

As they wheeled him further into the exam room, Plaintiff again asserted that he knew they planned to cut his head off and take his heart out. Dr. Okoro and other medical staff continued to try to clean his head wound. He accused the medical providers of taking his brain out, repeated that he was dead, and asked them why they were killing him. *Id.* at 38:13–30. Dr. Okoro then said that the wound was not going to stop bleeding and asked someone to get him the staple gun. *Id.* at 38:28. Plaintiff insisted that the staff were there to murder him. A nurse asked him, "tell me where you're at," and he responded, "I'm in a funeral home." *Id.* at 38:37–45. The nurse told him that Dr. Okoro was going to staple his wound shut, and he said, "I know what you're doing, you're taking my eyes out." *Id.* at 39:07. Defendant Davis walked out of the exam room as Dr. Okoro began to apply the staples to Plaintiff's wound. *Id.* at 39:12.

The medical records provided by Plaintiff show that the wound was 3.5 inches long and was closed with seven staples. Dkt. No. 75 at 20.

Defendant Davis argues that he is entitled to summary judgment because the summary judgment evidence shows that (1) he did not use force against Plaintiff after he was handcuffed, and (2) he did not hold Plaintiff down or administer treatment to him. So he contends that the

evidence shows he did not violate Plaintiff's constitutional rights, and in any event, he is entitled to qualified immunity because Plaintiff failed to show that his actions were unreasonable in light of clearly established law.

## 3. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, courts must not make credibility determinations or weigh evidence but must instead draw all reasonable inferences for the non-moving party. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002). That said, summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). And the Court need not accept the plaintiff's version of the facts where the record evidence clearly contradicts those allegations. *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).

### B. Qualified Immunity

Section 1983 "provides a claim against anyone who 'under color of any ordinance, regulation, custom, or usage, of any State' violates another's constitutional rights." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). "A plaintiff makes out a [Section] 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293–94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 23, 236 (5th Cir. 2008)).

But even if a defendant can be shown to have violated another's constitutional rights, the defendant may not be liable under Section 1983. Defendants who perform discretionary duties—such as police officers and jailers—may invoke the affirmative defense of qualified immunity in response to a plaintiff's Section 1983 suit. Qualified immunity applies "when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).

In analyzing whether an individual defendant is entitled to qualified immunity, the court considers whether the plaintiff has alleged any violation of a clearly established right, and, if so, whether the individual defendant's conduct was objectively reasonable. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Duckett v. City of Cedar Park*, 950 F.2d 272, 276–80 (5th Cir. 1992). In so doing, the court should not assume that the plaintiff has stated a claim, i.e., asserted a violation of a constitutional right. *Siegert*, 500 U.S. at 232. Rather, the court must be sure that, if the facts alleged by plaintiff are true, a violation has clearly occurred. *Connelly v. Comptroller*, 876 F.2d 1209, 1212 (5th Cir. 1989). Even if defendants are alleged to have acted in unison, the court must address the actions of each individually to determine whether qualified immunity applies. *Cass v. City of Abilene*, 814 F.3 721, 730–31 (5th Cir. 2016); *Meadours v. Ermel*, 483 F.3 417, 421–22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

A mistake in judgment does not cause an officer to lose his qualified immunity defense. The Supreme Court explained long ago that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341–43 (1986)). And "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley*, 475 U.S. at 341. Further,

that the officer himself may have created the situation does not change the analysis. That he could have handled the situation better does not affect his entitlement to qualified immunity. *Young v. City of Killeen*, 775 F.2d 1349, 1352–53 (5th Cir. 1985).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted). "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.731, 741 (2011). In rare cases, however, "the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *cf. Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that [the plaintiff's] conditions of confinement offended the Constitution.").

The Supreme Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). Likewise, the Supreme Court has stated that the purpose of the doctrine is to "give[ ] government officials breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 6 (2013). "Accordingly, 'qualified immunity represents the norm,' and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 807 (1982)). When a defendant invokes qualified immunity in his answer, the burden shifts to the plaintiff to show that the defense is unavailable. *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019).

Defeating an invocation of qualified immunity requires that the plaintiff "point to summary judgment evidence (1) that [the official] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was clearly established at the time." *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (internal quotation marks omitted). So, while the "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment," *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020), the plaintiff bears a heavy burden in overcoming a defendant's good-faith invocation of qualified immunity. *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016).

Although Supreme Court precedent does not require a case directly on point, existing precedent must place the statutory or constitutional question beyond debate. *Pauly*, 580 U.S. at 79. That is, the clearly established law on which a plaintiff relies should not be defined at a high level of generality but must be particularized to the facts of the case. *Id.* at 79–80. Thus, failure to identify a case in which an officer acting under similar circumstances was held to have violated a plaintiff's rights will most likely defeat the plaintiff's ability to overcome a qualified immunity defense. *Id.*; *Surratt v. McClarin*, 851 F.3d 389, 392 (5th Cir. 2017).

**4. Analysis**

After reviewing the pleadings, relevant summary judgment evidence, and applicable law, the Court finds that no genuine issues of material fact remain to require trial. Plaintiff has not pointed to any evidence in the record to raise a genuine fact issue to negate Defendant's well-pleaded qualified-immunity defense. In short, he has not carried the burden of proving that

Defendant's actions were objectively unreasonable in light of clearly established law at the time of the alleged encounter.

**A. Video Evidence**

The first problem for Plaintiff is that Defendant produced authenticated video recordings of the entire encounter. And the video footage directly contradicts many of Plaintiff's assertions. Specifically, the video footage contradicts Plaintiff's claims that he remained calm throughout the encounter, that he consistently refused medical treatment, that he screamed in pain as Defendant Davis pulled him back onto the stretcher, and that Davis continued to hold him face down on the stretcher after he was restrained and while the doctor stapled his head wound. *See* Video 7. So, the Court does not accept Plaintiff's version of the facts where the record evidence clearly contradicts those allegations. *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)).

**B. Use of Force**

Claims of excessive use of force during an arrest are governed by the Fourth Amendment's reasonableness standard. *Garza v. Briones*, 943 F.3d 740, 744 (5th Cir. 2019), *no cert.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)). Under this standard, the "plaintiff must show (1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Id.* (quoting *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009)).

Courts must consider the totality of the circumstances when evaluating the reasonableness of a use of force. *Garza*, 943 F.3d at 745; *see also Martin v. Seal*, 510 F. App'x 309, 313 (5th Cir. 2013) (holding that the question of whether force used by an officer was reasonable must be evaluated in the context in which the force was deployed); *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996); *Williams v. Bramer*, 180 F.3d 703, 704 (5th Cir. 1999). Courts

should not Monday-morning-quarterback an officer's split-second decision. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see also Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009). Instead, courts should view excessive-force claims "from the perspective of a reasonable officer on the scene" considering only those facts the officers knew at the time. *Garza*, 943 F.3d at 745 (quoting first *Escobar v. Montee*, 895 F.3d 387, 394 (5th Cir. 2018), then citing *Pauly*, 580 U.S. at 77–78). "Further, only the objective reasonableness of force matters for Fourth Amendment purposes—an officer's subjective motivation and intent are irrelevant." *Hill*, 587 F.3d at 234.

The injury must "overcome the *de minimis* requirement" to be cognizable. *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017). The courts must consider the relationship between the amount of force allowed by the constitution as compared to the extent of the injury itself. *Id.* (citing *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996)).

When evaluating the second element of the claim, a plaintiff does not have to prove that the "excessive force was the sole cause" of the injury or death, nor that such injury or death was foreseeable. *Goode v. Baggett*, 811 F. App'x 227, 231 (5th Cir. Apr. 24, 2020) (citing first *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996), and then *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018)). As a result, preexisting conditions do not factor into the analysis. *Baggett*, 811 F. App'x at 231. Essentially, the excessive force alleged need only be a "contributory cause" of the injury. *Id.* (quoting *Darden*, 880 F.3d at 728).

Finally, the third element is evaluated by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Baggett*, 811 F. App'x at 231–32 (quoting *Goodman v. Harris Cty.*, 571 F.3d 388, 397 (5th Cir. 2009)). Rather than a mechanical application, courts should balance these factors: "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These considerations are broadly known as the *Graham* factors.

**i. Injury**

Defendant does not directly dispute Plaintiff's claimed injuries, instead focusing on the reasonableness of his actions during the encounter. The Court notes, however, that although Plaintiff asserts that Defendant's use of force tore both of his rotator cuffs, he relies only on his own conclusory allegation and offers no supporting facts or evidence. Moreover, Plaintiff attributes his injuries to other force used during the encounter, not necessarily to Defendant Davis's use of force after he was restrained in handcuffs. *See* Dkt. Nos. 13 at 7; 33 at 10–11. Plaintiff does not allege that he sought or received medical attention for his shoulders at any time after the incident or that any imaging was done. Although he contends that he suffered lasting pain and discomfort in his shoulders after the incident, he appears to rely only on his own conclusion that his rotator cuffs were torn.[2]

The Court does not have to accept Plaintiff's conclusory allegations, offered without any specific factual or evidentiary support. *See Schultea v. Wood,* 47 F.3d 1427, 1433 (5th Cir. 1995); *see also Hemphill*, 805 F.3d at 538 (explaining that summary judgment "may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence"). Even so, for the purpose of his motion, Defendant does not dispute that Plaintiff's injury is more than *de minimis.*

In any event, even if the Court accepts Plaintiff's unsupported conclusions about the extent of his injuries as true, it does not alter the outcome of this case. The degree of injury is

---

[2] In his responses to the Magistrate Judge's questionnaire, Plaintiff claims that he talked to a jail nurse and told her that he needed a bottom bunk because his rotator cuffs were torn. Dkt. No. 13 at 20. She told him he could not know that without an MRI. He now says that he is open to medical tests and imaging to confirm his suspicions, but there is no evidence that any imaging ever occurred.

relevant to but not dispositive of the excessive-force claim. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (explaining that "[i]njury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts"). Thus, any remaining dispute over the extent of Plaintiff's injuries would not necessitate trial because the force used by the defendant was reasonable in the context of Plaintiff's erratic and unstable behavior.

**ii. Nature of Defendant's Force**

The "touchstone of the Fourth Amendment is 'reasonableness,'" which is "measured in objective terms" considering the totality of the circumstances. *Barnes v. Felix*, 605 U.S. 73, 79 (2025). Considering the totality of the circumstances here, the force used by Defendant Davis after handcuffing Plaintiff was reasonable. The summary judgment evidence shows that Plaintiff had suffered a head injury, had a 3.5-inch laceration on his forehead, was making delusional statements and behaving erratically, and had just bitten Defendant Davis. Plaintiff admits, and the video supports, that he was suffering from some delusional ideations while in the hospital. Medical staff asked the officers and paramedics to assist in trying to get Plaintiff into a treatment room. And, in his panic over being taken to what he called "the death room," where he believed he would be executed, Plaintiff began to flail. When Defendant instructed him to stay seated on the moving gurney, he struggled against Defendant, biting Defendant in the process.

And given this context—including his head injury, his erratic and unstable behavior, and his intervals of active resistance—Defendant Davis reasonably believed that Plaintiff posed an immediate threat to himself and to the medical staff, first responders, and other bystanders in the hospital setting. Moreover, Plaintiff's bite constituted a new crime—assault on a public servant. Thus, the *Graham* factors generally support Defendant's assertion of qualified immunity.

But the Court recognizes that the facts of this case, as established by the video evidence, do not neatly fit within the *Graham* rubric because of the nature of the force here and the circumstances of Plaintiff's arrest. The Graham factors would be more relevant if the Court were reviewing the force used before and during Plaintiff's arrest. But Plaintiff's remaining live claims rely only on the force used after his handcuffing. And, as the video conclusively shows, and contrary to Plaintiff's assertions, that force is limited to Defendant lifting Plaintiff to reposition him onto the bed.

In other words, Defendant Davis did not use the force in question in response to Plaintiff's resistance or even in response to Plaintiff's biting him. He used force only to reposition Plaintiff from a haphazard—and probably uncomfortable—position hanging off the side of the bed, to a more stable, supported position on the bed. In doing so, Defendant's force was neither excessive nor unreasonable.

Moreover, Plaintiff fails to identify a case in which an officer acting under similar circumstances was held to have violated a plaintiff's rights, so he cannot overcome Defendant's qualified immunity defense. "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (quoting *Mullenix*, 577 U.S. at 12); *see also Zorn v. Linton*, 607 U.S. ---, 146 S. Ct. 926, 930–31 (2026). In short, Plaintiff has failed to demonstrate that Defendant Davis's actions in lifting him back onto the hospital bed following his arrest constituted excessive force in violation of his clearly established constitutional rights.

**C. Forced Medical Care**

Plaintiff also asserts that Defendant violated Plaintiff's clearly established right to refuse medical care. Plaintiff acknowledges that the video does not depict Defendant Davis holding

him down during the procedure as he previously claimed, but he asserts that Defendant is still responsible because he placed Plaintiff in handcuffs "to enable the hospital staff to administer the unwanted medical care." Dkt. No. 71 at 25.

The Supreme Court has established "that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990). But the Court cautioned that the inquiry cannot end there; "whether [a plaintiff's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 279.

Even if there were a genuine dispute over whether Plaintiff was competent to refuse medical treatment in the midst of what he described as "acute psychosis," Dkt. No. 33 at 10, his claim here would fail. Whether or not Plaintiff was competent, Defendant Davis reasonably deferred to the opinions of the medical providers and allowed them to administer treatment for Plaintiff's head wound.

Indeed, throughout the encounter, Defendant Davis faced a series of no-win decisions. It is undisputed that Defendant Davis was dispatched to Plaintiff's home for a welfare check after Plaintiff's neighbor observed him outside covered in blood. Extensive Fourth Amendment jurisprudence recognizes that officers like Defendant Davis are often called on to perform community caretaking functions and render emergency aid—tasks that are separate from any sort of criminal investigation. *Bakutis v. Dean*, 129 F.4th 299, 303 (5th Cir. 2025). And, under Texas law, Defendant Davis had a duty to request and render aid. Tex. Code Crim. P. Ann. art. 2.33 (West 2022), *repealed by* Acts 2023, 88th Leg., ch. 765 (H.B. 4504), § 3.001(4), eff. Ja. 1, 2025, and recodified at Tex. Code Crim. Proc. Ann. Art. 2B.0301 (West 2025).

So when Defendant Davis encountered Plaintiff sitting in a pile of trash, bleeding profusely from his head, with disheveled and ripped clothing, he reasonably opted to seek

medical attention. And although Plaintiff expressed distrust of Defendant Davis and Officer Wells, he expressly and repeatedly asked for an ambulance and demanded help. Plaintiff also insisted that he wanted immediate medical attention when he first arrived at the hospital. In fact, he became agitated at the delay in seeing a doctor and began to accuse the staff of leaving him to die.

Plaintiff's injury was obvious and objectively serious. His neighbor saw him bleeding and called for help. As soon as Defendant Davis approached Plaintiff, he could see that Plaintiff had blood running down his face with a large gash on his forehead. Plaintiff also had one bare foot, a torn pantleg, and a large rash or abrasion on his leg. There was blood on the porch and smeared on the door of the house. The paramedics noted that the gash was deep and they could see Plaintiff's skull. Sgt. Shannon said that there was no doubt about it—Plaintiff needed stitches. The hospital staff also recognized that Plaintiff needed medical attention. Once Dr. Okoro was finally able to get Plaintiff's wound cleaned up, he asserted that the bleeding would not stop, and he would have to apply staples.

Plaintiff's mental state did not help matters. Throughout the encounter, he appeared confused and, at times, even delusional. He repeatedly asked for help, then accused his helpers of shooting him, plotting to kill him, beheading him, and removing his organs. Likewise, he told them to leave him alone, then accused them of neglecting him, allowing him to bleed out, and leaving him to die. He insisted that the officers were not real, the emergency vehicles were grave-diggers, the hospital bed was a casket, and the hospital itself was a funeral home. He begged for water, then refused it when it came in a cup rather than a bottle. Defendant

reasonably questioned whether Plaintiff could make reasoned decisions, and in any event, whether to trust Plaintiff's pleas for help or his refusals to accept help when offered.[3]

Plaintiff now argues that Defendant should have walked away—leaving Plaintiff disoriented and bleeding from an obvious head wound. But doing so would mean neglecting his statutory—and ethical—obligation to render aid, and potentially risking liability for whatever harm befell Plaintiff as a result. This is the sort of damned-if-you-do, damned-if-you-don't decision that qualified immunity protects. Considering the totality of the circumstances, Defendant reasonably chose to request and render aid and to secure the scene and ensure the safety of Plaintiff and the responding EMTs.

Defendant continued in that duty after Plaintiff arrived at the hospital. He helped get Plaintiff checked in, providing necessary background information for the medical team, and contacting Plaintiff's son and MHMR personnel. But as the video evidence conclusively establishes, Defendant Davis disengaged from Plaintiff as soon as he was handcuffed and lifted back onto the hospital bed. Defendant did not hold Plaintiff down during the stapling procedure—he walked out of the room. And once Dr. Okoro was able to clean and examine Plaintiff's wound, he determined that staples were necessary.

In light of the video evidence, it is indisputable that Defendant was not personally involved in administering the unwanted medical care. A defendant must be personally involved to be held responsible for a constitutional deprivation, which requires an affirmative link between the incident and some act by the defendant. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976);

[3] The Magistrate Judge concluded that Plaintiff's conviction required the Court to find that he was competent throughout the encounter to avoid casting doubt on his culpability for the offense. Dkt. No. 44 at 17 n.14. But "there are significant differences between a claim of incompetence and a plea of not guilty by reason of insanity." *Medina v. California*, 505 U.S. 437, 449 (1992). And in any event, the Court makes no finding on whether Plaintiff was actually competent during the encounter, only on whether Defendant reasonably perceived him to be incompetent. Here, Defendant reasonably questioned Plaintiff's competence based on Plaintiff's erratic speech and behavior.

*see also Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983) (explaining that a defendant "must be either personally involved in the acts causing the deprivation of a person's constitutional rights, or there must be a causal connection between an act of the [defendant] and the constitutional violation sought to be redressed").

Assuming, however, that Defendant's actions in arresting Plaintiff and securing him in handcuffs before the procedure are enough to hold him responsible for the unwanted medical treatment, Defendant is still entitled to qualified immunity. After Plaintiff's arrest, clearly established law required Defendant Davis to provide Plaintiff with appropriate medical care. See *Stokes v. Porretto*, 2006 WL 2844172, at *15 (S.D. Tex. Sept. 29, 2006) (collecting cases); see also *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 474 (5th Cir. 1996) ("At least since 1987, it has been clear that pretrial detainees, a set that includes arrestees, are entitled to reasonable medical care"). The State has "an obvious interest in ensuring that detainees admitted to the jail do not need immediate medical care, as such treatment and care may not be readily available." *Sullivan v. Bornemann*, 384 F.3d 372, 376 (7th Cir. 2004). If he had failed to do so, he would have risked liability if Plaintiff's symptoms escalated or his wound became infected while he was in custody. *See id.*

Indeed, jurisprudence from other courts "strongly suggest that the *Cruzan* decision would not be extended to hold officers liable for excessive force after restraining a patient for unwanted medical treatment prescribed by medical personnel," because doing so would be "a vast and unprecedented judicial leap." *Nelson v. Lott*, 330 F. Supp. 3d 1314, 1334 (N.D. Ala. 2018) (collecting cases). The Sixth Circuit has even found that suturing an inmate's open head wound against his will did not violate his Fourteenth Amendment rights. *Davis v. Agosto*, 89 F. App'x 523, 528–29 (6th Cir. 2004). The Sixth Circuit determined that "it was well within the authority" of the officials "to determine that closing the wound was necessary to the health and

safety of [the plaintiff] as well as those around him." *Id.* And "had they opted not to provide the treatment, the officials could have subjected themselves to a deliberate-indifference claim and would of course have remained responsible for providing any further medical treatment prompted by the failure to close the wound." *Id.*

Here, Defendant reasonably deferred to the treatment decisions of the medical professionals. *See Est. of Allen v. City of Rockford*, 349 F.3d 1015, 1020 (7th Cir. 2003) (finding that officers reasonably deferred to a licensed physician's determination that treatment was necessary, and that preventing the treatment would have left them liable for failure to provide appropriate medical care to a pretrial detainee); *Brownell v. Figel*, 950 F.2d 1285, 1291 (7th Cir. 1991) (explaining that it would be "unrealistic" to expect police officers to second-guess a physician's medical diagnosis).

In short, Plaintiff has failed to show that Defendant's actions violated Plaintiff's clearly established constitutional rights. Plaintiff points to cases that establish only the general right to refuse unwanted medical care, in contexts quite different from the facts here, but he identifies no binding authority that would put Defendant on notice that his conduct here was unreasonable. As a result, Plaintiff has failed to overcome the defendant's assertion of qualified immunity, and Defendant is entitled to summary judgment on Plaintiff's forced-medical-care claim.

**5. Conclusion**

Because the video evidence blatantly contradicts much of Plaintiff's version of events, there remains no genuine dispute over the material facts. Defendant asserted the defense of qualified immunity in good faith, and Plaintiff has failed to point to any evidence in the record to show that Defendant's actions violated his constitutional rights or that they were unreasonable in light of clearly established law.

For these reasons, the Court finds that Defendant's motion for summary judgment should be granted, that Plaintiff take nothing on his claims against Defendant, and that all remaining claims should be dismissed with prejudice.[4]

All relief not expressly granted is denied, and any other pending motions are denied. The Court will enter judgment accordingly.

Dated September 1, 2026.

JAMES WESLEY HENDRIX
United States District Judge

[4] As explained in the Court's order adopting the Magistrate Judge's findings, conclusions, and recommendation, Dkt. No. 48, Plaintiff's claims based on Defendant's conduct prior to and including restraining Plaintiff in handcuffs during his arrest are dismissed with prejudice until he demonstrates that he has satisfied *Heck's* favorable-termination requirement.